UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

—————————————————————————  :
                              :
ERNEST LAWRENCE,              :
                              :
          Petitioner,         :    Civ. No. 17-2458 (NLH)
                              :
     v.                       :    OPINION
                              :
THE ATTORNEY GENERAL FOR THE  :
STATE OF NEW JERSEY,          :
ADMINISTRATOR OF NEW JERSEY   :
STATE PRISON,                 :
                              :
          Respondents.        :
—————————————————————————  :

APPEARANCES:
Ernest Lawrence, No. 502721D
New Jersey State Prison
PO Box 861
Trenton, NJ 08625
     Petitioner pro se

Sarah Diane Brigham
Office of the Attorney General
Division of Criminal Justice
25 Market Street, 5th Floor West Wing
PO Box 086
Trenton, NJ 08625
     Counsel for Respondents

HILLMAN, District Judge

     Petitioner Ernest Lawrence ("Petitioner"), a prisoner

presently incarcerated at New Jersey State Prison in Trenton,

New Jersey, has filed a Petition for a Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254 (the "Petition").  ECF No. 1.

Respondents Steven Johnson and the Attorney General for the

State of New Jersey ("Respondents") filed an Answer to the

Petition (the "Answer"). ECF No. 5. For the following reasons, the Court will deny the Petition and a certificate of appealability shall not issue.

## I.   BACKGROUND

In its opinion on direct appeal, the Superior Court of New Jersey, Appellate Division, provided the following summary of the factual background of Petitioner's case:

> The State's trial evidence established that early on the morning of January 8, 2008, in the basement of a Camden row home where defendant lived with nineteen-year old Jennifer Lane and their two small children, he stabbed Lane seventeen times with a paring knife. Lane staggered upstairs to the first floor where she collapsed and died. Defendant hurried upstairs and exited the row home, dropping the paring knife by the front door as he left. The police found defendant a short distance away, suffering from five stab wounds to his chest. At the time, the police did not know his wounds were self-inflicted.
>
> Defendant was admitted to Cooper Hospital where he underwent surgery for a collapsed lung. The next day, Camden County Prosecutor's Investigator John Greer and Camden City Detective Isidoro Reyes questioned defendant at the hospital. When the officers first began to question defendant, they did not inform him of his *Miranda* rights, but after he told them that Lane had stabbed him and he had stabbed Lane, they informed him of his rights, which he waived. Defendant told Investigator Greer that he and Lane stabbed each other during an argument, but he did not know who stabbed the other first. Denying that he would ever cut himself, defendant told Investigator Greer that all of his wounds had been inflicted by Lane. Defendant also said that after he got hit a couple of times, he "pulled" the knife

2

and began swinging at her. After stabbing
Lane, defendant left the row home to calm
down. Unaware of the extent of his wounds, he
intended to return, but he passed out.

Later the same day, Investigator Greer
returned to the hospital to photograph
defendant's hands because defendant had
claimed he and Lane were stabbing each other,
but he had no defensive wounds on his hands.
Defendant consented, and Investigator Greer
photographed his hands.

The police did not charge defendant with
Lane's murder until January 22, 2008. They
were unable to apprehend him for two days. On
January 24, 2008, at five o'clock in the
morning, defendant purchased a round-trip
ticket for a flight from Atlantic City to
Kingston, Jamaica with a stop in Florida.
Florida authorities arrested defendant when
his plane landed in Fort Lauderdale. The next
day, Investigator Greer and Detective Reyes
travelled to Florida and questioned defendant
a second time. Defendant told Investigator
Greer that throughout the day and night
leading up to the homicide, Lane "kept leaving
every minute with a friend of hers" who
defendant characterized as her "Ex." When Lane
returned after one visit with her friend,
defendant argued with her about taking care of
the children, who were hungry. According to
defendant, the argument escalated and "we
[got] stabbed." Defendant said, "I got
stabbed, she got stabbed and that's all I can
remember from there."

Defendant blamed Naquia Rollins, a friend with
whom Lane previously had an intimate
relationship, for repeatedly interfering
with, and jeopardizing, his relationship with
Lane. Nevertheless, defendant did not believe
Lane had resumed her affair with Rollins.
Defendant eventually admitted that he stabbed
Lane and then stabbed himself.

According to Rollins and the first and second floor residents of the row home where defendant lived, defendant had previously threatened Lane. Rollins testified about the threat defendant made the afternoon before he stabbed Lane. On the day before Lane's death, Rollins visited Lane for about twenty minutes early in the day, then returned later and drove Lane to a grocery store to get some milk. When they returned to the row home, defendant walked up to the van Rollins was driving and accused Rollins of lying to him on a previous occasion. According to Rollins, defendant said "he didn't like what was going on and that he would make sure that I never see her again and there was nothing nobody can do about it."

Rollins and Lane drove away in the van, watched television at Lane's aunt's house, then returned to Lane's row home at approximately 9:45 p.m. While they talked inside the van, defendant came out of the row home, unbuckled Lane's seatbelt, and "grabbed her out of the car." Rollins drove away. That was the last time Rollins saw Lane alive.

James Glover, who lived on the second floor of the row home, was sitting on the front porch when defendant returned from work. Later that evening, a white van "pulled up" with Lane in the passenger seat. Defendant emerged from the row home, walked to the white van, said something to Lane, then returned to the porch. He said to Glover, "I'm gonna kill that girl." He then waited about two minutes, and went into the house.

Kimell Young, who owned the row home and lived on the first floor, talked to defendant while he was sitting on the front steps of the home the day before Lane's death. Lane was getting into Rollins' white van, and defendant was angry. Defendant told Young, "if [I] can't have her, nobody is gonna have her. I hate that bitch." Young also testified that on a previous occasion defendant said the only way

Lane would listen to him was if he shook her up, meaning that he had to push her around.

Defendant called one witness at trial, his sister. She testified that when defendant was discharged from the hospital he was so physically debilitated and mentally depressed that she could not care for him, so she suggested he return to their family in Jamaica where he could be properly cared for during his recuperation.

A Camden County grand jury charged defendant in an indictment with first-degree murder, *N.J.S.A.* 2C:11-3(a)(1) and (2) (count one); third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39-4(d) (count two); fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39-5(d) (count three); and fourth-degree hindering apprehension or prosecution, *N.J.S.A.* 2C:29-3(b)(4) (count four). After he was indicted, defendant filed a motion to suppress the statements he had made in the Camden hospital and while in custody in Florida. Following three days of hearings, the court denied defendant's motion.

The court also conducted pre-trial hearings in which it ruled that the State could present the testimony of Young, Glover, and a first-floor boarder, Harry Winsch, concerning defendant's threats to harm Lane, and about the relationship defendant and Lane shared.

The trial took place on five non-consecutive days in September 2010. Defendant did not dispute that he stabbed Lane and then stabbed himself. Rather, he attempted to persuade the jury that he did not intend to kill Lane, but repeatedly stabbed her during an uncontrollable jealous rage caused by his fear that Lane might abandon him and the children and resume her relationship with Rollins.

The jury found defendant guilty on all counts. At sentencing, the court merged counts two and three into count one and sentenced defendant

> on count one to a forty-five year custodial
> term subject to NERA. The court also sentenced
> defendant to a concurrent eighteen-month
> prison term on count four, and imposed
> required fees and assessments.

State v. Lawrence, No. A-4252-10T2, 2013 WL 4045596, at *1–3
(N.J. Super. Ct. App. Div. Aug. 12, 2013) (internal footnotes
omitted).

Following his conviction, Petitioner filed a direct appeal.
See ECF No. 6-4 at 99. On August 12, 2013, the Appellate
Division affirmed Petitioner's conviction and sentence, but
remanded the matter for correction of the judgment of conviction
to reflect the appropriate amount of jail credits. See
Lawrence, 2013 WL 4045596, at *12–13. The New Jersey Supreme
Court denied certification of Petitioner's direct appeal on
March 20, 2014. State v. Lawrence, 88 A.3d 190 (N.J. 2014).

Petitioner thereafter filed his petition for post-
conviction relief ("PCR") in state court raising several
ineffective assistance of counsel claims. See ECF Nos. 6-14, 6-
15. The petition was denied. See ECF No. 6-39. On appeal from
the PCR court's denial, Petitioner challenged his trial
counsel's alleged failure to: (1) investigate Petitioner's
mental health at the time of the crime, and (2) review all of
the discovery in the case. See State v. Lawrence, No. A-3917-
14T1, 2016 WL 5210616, at *1 (N.J. Super. Ct. App. Div. Sept.
22, 2016). The Appellate Division affirmed the PCR court's

decision denying Petitioner relief.  See id. at *3.  The New

Jersey Supreme Court denied certification.  See State v.

Lawrence, 169 A.2d 982 (N.J. 2017).

In January 2017, Petitioner filed the instant habeas

petition, pro se.  See ECF No. 1.  His application raises the

following claims:

> GROUND ONE: "The Defendant's statements were
> taken in violation of his constitutional
> rights against self-incrimination, and
> accordingly must be suppressed ((U.S. Const.
> Amends. V, XIV, N.J. Const. (1947), Art. I,
> Par. 10)"
>
> GROUND TWO: "The trial court erred to
> defendant's prejudice in refusing to deliver
> a limiting instruction as to highly
> prejudicial evidence of prior statements by
> the defendant."
>
> GROUND THREE: "The Defendant was greatly
> prejudiced by baseless and unremediated
> testimony produced by the State that he had
> previously hit the victim"
>
> GROUND FOUR: "The Appellant herein argues
> that the trial court erred in its ruling by
> admitting prior bad act evidence over trial
> counsel's objections and without limiting
> instructions in violation of his due process
> under both N.J. State and Federal
> Constitutional Amendments"
>
> GROUND FIVE: "The Defendant will argue
> prosecutor misconduct for submitting overly
> prejudicial evidence during summation and
> through the use of State witnesses
> concerning the defendant's children walking
> in a pool of blood and lying downstairs near
> a pool of blood."
>
> GROUND SIX: "The Trial Court gave erroneous

jury instructions concerning the jury
confusion to clarify Count 4 as to attempt
to leave the country on the 8th Day of
January 2008."

GROUND SEVEN: "Failure of the Trial Court to
suppress the Defendant's First Statement to
Investigators was error because it was not
fully established that the Defendant's
medication made him coherent to the
questions presented which incriminated him."

GROUND EIGHT: "Trial Counsel's
Ineffectiveness for failing to investigate
Defendant's 'Mental Health Problem at the
time of the crime.'"

ECF No. 1-3.

GROUND NINE: "This matter must be remanded
for findings of fact and conclusions of law
regarding defendant's claim that trial
counsel failed to review all the discovery."

ECF No. 7.

## II.   STANDARD OF REVIEW

A petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 is the proper mechanism for a state prisoner to challenge

the fact or duration of his confinement where the petitioner

claims his custody is in violation of the Constitution or the

laws of the United States.  See 28 U.S.C. § 2254(a); Cullen v.

Pinholster, 563 U.S. 170, 181 (2011); Preiser v. Rodriquez, 411

U.S. 475, 498-99 (1973).  A habeas petitioner bears the burden

of establishing his entitlement to relief for each claim

presented in the petition. See Harrington v. Richter, 562 U.S.

86, 98 (2011).

The standard used in reviewing habeas claims under § 2254 depends on whether those claims have been adjudicated on the merits by the state court. If they have not been adjudicated on the merits, the Court reviews de novo both legal questions and mixed factual and legal questions. See <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001). If the state court adjudicated the claim on the merits, then 2254(d) limits the review of the state court's decision as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding . . . .

28 U.S.C. § 2254(d).

If a claim has been adjudicated on the merits in state court,[1] this Court has "no authority to issue the writ of habeas

---

[1] "[A] claim has been adjudicated on the merits in State court proceedings when a state court has made a decision that finally resolves the claim based on its substance, not on a

corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Parker v. Matthews, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v.

---

procedural, or other, ground." Lewis v. Horn, 581 F.3d 92, 100 (3d Cir. 2009) (quoting Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009)). "Section 2254(d) applies even where there has been a summary denial." Pinholster, 563 U.S. at 187. "In these circumstances, [petitioner] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state court's] decision." Id. (quoting Harrington v. Richter, 562 U.S. 86, 98 (2011); see also Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted.").

_Andrade_, 538 U.S. 63, 71-72 (2003).  "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA."  _Parker_, 567 U.S. at 48-49 (quoting 28 U.S.C. § 2254(d)(1)).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" _Williams_, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  _Williams_, 529 U.S. at 413.  "[A]n unreasonable application of federal law," however, "is different from an incorrect application of federal law."  _Harrington v. Richter_, 562 U.S. 86, 101 (2011) (quoting _Williams_, 529 U.S. at 410).

### III. DISCUSSION

#### A. Denial of Petitioner's Motion to Suppress

In Ground One, Petitioner alleges that the trial court

erred in denying his motion to suppress two statements he made to police, arguing that both statements were taken in violation of his constitutional right against self-incrimination. <u>See</u> ECF No. 1-3 at 3. Petitioner contends that the first statement, which he provided to police while in the hospital on January 9, 2008, was a custodial interrogation for which he should have immediately been advised of his <u>Miranda</u> rights. <u>See</u> <u>id.</u> Petitioner contends that his second statement, which he provided while he was in custody in Florida on January 25, 2008, was also invalid because the interviewing officers failed to advise him that he had been charged with murder. <u>See</u> <u>id</u>.

   *i. Hospital Statement*

    Petitioner asserts that when police visited him in the hospital on January 9, 2008, the entire encounter constituted a custodial interrogation, and, as such, he should have been advised of his <u>Miranda</u> rights prior to any questioning. <u>See</u> ECF No. 3-5. Petitioner states that he was, at all times, "in custody" in his hospital room because there were officers stationed outside of his door, he was physically unable to leave given his medical condition, and "[t]he questioning was entirely focused upon an incident in which the defendant's companion was stabbed to death, a fact which would leave no doubt in the mind of any rational person that he was or was becoming a focus on [sic] the police investigation." <u>See</u> ECF No. 1-3 at 3-5. In

denying this claim on direct appeal, the Appellate Division

reasoned:

> Considering the totality of circumstances in the case before us, we conclude the trial court did not err by denying defendant's suppression motion. Investigator Greer and Detective Reyes did not know that defendant had stabbed himself when they interviewed him in the hospital. Nothing at the crime scene and nothing that any witness had told the detectives suggested that defendant's wounds had been self-inflicted. One witness had given a statement that suggested a third party may have been involved in the stabbing. Although Investigator Greer and Detective Reyes admittedly considered defendant a suspect, the circumstances surrounding the homicide were anything but clear.
>
> Defendant's confinement to a hospital bed due to his injuries did not present an atmosphere suggestive of custodial interrogation. As our Supreme Court has recognized, a hospital room is "totally lacking the 'compelling atmosphere inherent in the process of in-custody interrogation.'" *State v. Zucconi,* 50 *N.J.* 361, 364 (1967) (quoting *Miranda, supra,* 384 *U.S.* at 478, 86 *S.Ct.* at 1630, 16 *L. Ed.*2d. at 726). And though police were posted at the door of defendant's room, defendant had confirmed with them, before Investigator Greer and Detective Reyes arrived to question him, that they were there for his protection. Investigator Greer made clear to defendant, almost immediately after Investigator Greer introduced himself and Detective Reyes, that defendant was not under arrest and, if capable, was free to leave.
>
> Investigator Greer and Detective Reyes also explained to defendant that their purpose in speaking to him was to learn what happened

at the row home. They did not make any
accusations, and spoke with defendant less
than five minutes before he told them that
he and Lane stabbed each other.

[. . .]

Accordingly, we affirm the trial court's
determination that Investigator Greer's
initial questioning of defendant in the
hospital room was not a custodial
interrogation.

<u>Lawrence</u>, 2013 WL 4045596, at *7-8.

The Fifth Amendment provides, in part, that no person

"shall be compelled in any criminal case to be a witness against

himself." <u>See</u> U.S. Const. amend. V. The Fourteenth Amendment

incorporates the Fifth Amendment privilege against self-

incrimination. <u>See</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 8 (1964). In

<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held

that "without proper safeguards the process of in-custody

interrogation ... contains inherently compelling pressures which

work to undermine the individual's will to resist and to compel

him to speak where he would not otherwise do so freely." <u>Id.</u> at

467.

However, <u>Miranda</u> warnings are required "only when the

person police are questioning is in custody." <u>See</u> <u>United States</u>

<u>v. Willaman</u>, 437 F.3d 354, 659 (3d Cir. 2006) (citing <u>Miranda</u>,

384 U.S. at 468). A person is "in custody" for purposes of

<u>Miranda</u> when "there is a 'formal arrest or restraint on freedom

of movement' of the degree associated with a formal arrest."
See California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting
Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  In the absence
of a formal arrest, the proper inquiry to determine whether an
individual is "in custody" is whether "in light of the objective
circumstances of the interrogation, a reasonable person would
have felt he or she was not at liberty to terminate the
interrogation and leave."  See Howes v. Fields, 565 U.S. 499,
509 (2012) (internal quotations and citations omitted).

Here, the record demonstrates that Petitioner was not "in
custody" during his January 9th interview.  At the hearing on
Petitioner's motion to suppress, Investigator Greer testified
that he visited Petitioner in the hospital in order to determine
what had occurred the day of the crime.  See ECF No. 6-4 at 71.
Investigator Greer testified that although Petitioner was a
suspect, he was "as much of a suspect as the victim and third-
party present at the scene."  Id.  Detective Reyes also
testified at the suppression hearing and he corroborated
Investigator Greer's statements.  Id. at 72.  Both officers
stated that they visited Petitioner to find out what had
happened to him and Jennifer Lane, and that as soon as
Petitioner began to implicate himself, Investigator Greer
immediately terminated the interview and advised Petitioner of
his Miranda rights before proceeding further.  Id. at 70, 72.

The transcript of Petitioner's subsequent statement further
validates the officers' testimony.

> [INVESTIGATOR GREER]: Um, when we came in
> here this morning I came in here um, I told
> you that we were um investigating to find
> out what exactly happened to you, correct?
>
> [PETITIONER]: Yes
>
> [INVESTIGATOR GREER]: And I advised you that
> you weren't under arrest um, at any time and
> um, you acknowledge that you understand that
> you're not under arrest is that correct?
>
> [PETITIONER]: Yes
>
> [INVESTIGATOR GREER]: Okay, and um, when we
> were asking you what happened you apparently
> during the course of what started as an
> argument um, you stabbed um, what's your
> baby's mom name?
>
> [PETITIONER]: Jennifer Lane
>
> [INVESTIGATOR GREER]: Jennifer, you stabbed
> Jennifer, Jennifer stabbed you and you're
> not sure who stabbed who first?
>
> [PETITIONER]: Yes
>
> [INVESTIGATOR GREER]: Okay.  Um, before I go
> any further I'm going to advise you of your
> rights ....

See id. at 101.

Petitioner also contends, however, that the presence of
officers outside his door conveyed a restraint on his freedom.
See ECF No. 1-3 at 4.  Yet this assertion is belied by testimony
of Investigator Greer, as well as by the transcript of

Petitioner's statement that day. Investigator Greer's testimony included, in pertinent part:

> [PROSECUTOR]: In the transcript, which I
> know defense counsel has and I provided to
> the court of that initial statement on
> January 9th, the defendant specifically makes
> reference to the officers outside his
> hospital room door.
>
> [INVESTIGATOR GREER]: Yes.
>
> [PROSECUTOR]: Could you explain that, what
> your understanding was of his understanding
> of why the officers were there?
>
> [INVESTIGATOR GREER]: Yes, mention was made
> of the officers that were out front and I
> don't remember specifically whether it was
> initiated by myself and my partner, or it
> was by the defendant, but the officers being
> present came up. And the defendant shared
> with us that he actually was aware of the
> fact that they were only there to protect
> and watch him, that they weren't there to --
> and I'm paraphrasing when I say this -- to
> make sure that he didn't leave the room
> because he was free to come and go as he
> pleased, because he was not under arrest.
>
> [PROSECUTOR]: And did the defendant actually
> say in the statement according to the
> transcript that he, himself, asked the
> officers why they were there?
>
> [INVESTIGATOR GREER]: Yes, prior to us
> arriving.
>
> [PROSECUTOR]: And that he was satisfied that
> from their response that they were there to
> watch over him in case anybody came.
>
> [INVESTIGATOR GREER]: That's correct. I
> expounded upon that afterwards, yes.

> [INVESTIGATOR GREER]: [. . .] The subject of
> the officers came up and I believe, more
> that I think about that it was actually me
> that initiated it, because his reply was
> that he was already aware of why they were
> there.  I brought up the fact that the
> officers were there for his own safety, and
> he said yeah I asked them that and again,
> I'm paraphrasing this, I asked them that
> question why they were here before or
> earlier, and they shared with me they were
> there to protect you, to make sure nobody
> comes into your room or things of that
> nature.  And I followed up by stating so you
> do understand you're not under arrest,
> you're free to go, they're here to protect
> you.  And he acknowledged that he did.

ECF No. 6-27 at 32-34.

The transcript of Petitioner's statement from January 9, 2008, also supports Investigator Greer's testimony.  See ECF No. 6-4 at 114.

> [INVESTIGATOR GREER]: Okay and just one last
> thing, the officer that you made reference
> to they are outside your door um, seeing
> them there you still, you understand that
> you are not under arrest?
>
> [PETITIONER]: Yes
>
> [INVESTIGATOR GREER]: And you knew prior to
> us getting here you were not under arrest?
>
> [PETITIONER] Yes
>
> [INVESTIGATOR GREER]: *And you could leave
> here any time you wanted if you were
> physically able?*
>
> [PETITIONER]: *Yes*
>
> [. . .]

> [PETITIONER]: Because I ask them, they say
> sorry they say they just here to watch over
> me in case anybody to come

Id. (emphasis added).

It is apparent from the record that Petitioner was aware that the officers outside of his hospital room were simply there to protect him, and that he knew the officers' presence was not to restrict his movement or prevent him from leaving the hospital.

Finally, to the extent that Petitioner argues that a hospital room itself is an inherently coercive environment, this argument also fails. The mere fact that Petitioner was in a hospital is not itself determinative of whether he was "in custody" for the purposes of Miranda. See United States v. Overington, A-07-147, 2007 WL 3119843, at *4 (E.D. Pa. Oct. 24, 2007) (individuals are not "'in custody' merely because they were interviewed by police in a hospital setting"). See also King v. Stewart, No. 17-1486, 2017 WL 5001407, at *2 (6th Cir. 2017) (holding that a defendant questioned by police while in the hospital was not "in custody"); Stechauner v. Smith, 852 F.3d 708, 715 (7th Cir. 2017) (same); United States v. Berres, 777 F.3d 1083, 1092 (10th Cir. 2015) (same); United States v. Infante, 701 F.3d 386, 396-98 (1st Cir. 2012); United States v. New, 491 F.3d 369, 373-74 (8th Cir. 2007); United States v. Jamison, 509 F.3d 623, 632 (4th Cir. 2007) (determining

defendant questioned in a hospital setting was not in police custody when he was "primarily restrained not by the might of the police, but by his self-inflicted gunshot wound [and] the medical exigencies it created."); United States v. Caldwell, Civ. No. 94-310-01, 1995 WL 461224, at *4 (E.D. Pa. Aug. 2, 1995), aff'd, 116 F.3d 470 (3d Cir. 1997) (holding that defendant was not in custody where he voluntarily checked into the hospital for treatment, he was not under arrest, and his freedom to "come and go" was not curtailed by the police).

In the instant action, the totality of the circumstances demonstrates that Petitioner was aware that he was not under arrest, that he was free to leave, and that he was able terminate the interview at any time. See Howes, 565 U.S. at 509. Based upon the record and the testimony of Investigator Greer and Detective Reyes, reasonable jurists could conclude that Petitioner was not in custody when he was questioned by police at the hospital. Accordingly, the state court's determination of Petitioner's claim was not an unreasonable application of federal law. Petitioner is not entitled to relief on this claim.

### ii. Florida Statement

Petitioner next argues that his statement to police while he was detained in Florida should also be suppressed. See ECF No. 1-3 at 5-6. Petitioner asserts that the State "failed to

carry its burden, beyond a reasonable doubt, that [Petitioner] was advised or aware of the charges against him before that statement was taken." Id. at 5. To support his claim, Petitioner points to the transcript of his statement in which the detectives never expressly informed him that he has been charged with murder. Id. at 6. Petitioner contends that Investigator Greer's testimony at the suppression hearing that he did, in fact, inform Petitioner of the pending murder charge prior to the start of the interview "is not borne out by a close examination of the evidence." Id. Although not explicitly stated, Petitioner appears to be alleging that the officers' failure to inform him of the murder charge against him invalidates his statement. See id.

The Appellate Division denied this claim on direct appeal, reasoning, in pertinent part:

> Investigator Greer testified that he and
> Detective Reyes flew to Florida and
> interviewed defendant in the Broward County
> Correctional Facility. On the day they
> interviewed defendant, when they entered the
> correctional facility's interview room,
> defendant was already seated. According to
> Detective Reyes, as they were walking in,
> defendant asked them why he had been charged
> with murder.
>
> Investigator Greer testified that he
> informed defendant of the murder charge
> "[i]n the very beginning of the interview
> when we initially met in the interview
> room." Defendant asked why he had been
> charged with murder. According to

Investigator Greer, defendant said
something, in the form of either a question
or statement, that led Investigator Greer to
believe that defendant knew of the murder
charges. Investigator Greer explained that
the exchange occurred before he was able to
set up his tape recorder.

In its written decision, the trial court
concluded defendant knew of the charges. The
court found that defendant expressed his
knowledge of the charges as the officers
entered the interview room and that
defendant did so before the officers could
start a tape recorder. The court also found
that nothing in defendant's statement or
conduct suggested a hint he was unaware that
he had been charged with murder.

The court's findings are supported by
sufficient credible evidence in the record.
In view of the deference that we owe to the
trial court's factual determinations, we
decline to accept defendant's invitation to
reject the court's findings. *See State v.
Locurto,* 157 *N.J.* 463, 471–72 (1999).
Rather, we affirm the denial of defendant's
suppression motion. The trial court did not
err by admitting the statement at trial.

<u>Lawrence</u>, 2013 WL 4045596, at *8.

<u>Miranda</u> requires four invariable warnings that suspects

must receive prior to being questioned:

(1) that [a suspect] has the right to right
to remain silent, (2) that anything he says
or does can be used against him in a court
of law, (3) that he has the right to the
presence of an attorney, and (4) that if he
cannot afford an attorney one will be
appointed for him prior to any questioning
if he so desires.

<u>Miranda</u>, 384 U.S. at 479.

None of the four warnings of <u>Miranda</u> expressly include a suspect's right to be informed of the charges pending against him prior to questioning. See <u>United States v. Clenney</u>, 631 F.3d 658, 668 (4th Cir. 2011) ("[<u>Miranda</u>] does not require that the suspect be informed of the charges against him."). Indeed, the Third Circuit has previously held that it was unaware of any authority "holding that a defendant must know of the charges against him to validate a *Miranda* waiver." See <u>United States v. Whiteford</u>, 676 F.3d 348, 362 (3d Cir. 2012); <u>see also</u> <u>United States v. Brown</u>, No. 3:17-CR-396, 2019 WL 1227429, at *4 (M.D. Pa. Mar. 15, 2019). In <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987), the Supreme Court considered a similar question. In <u>Spring</u>, federal agents learned from a confidential informant that the defendant had been involved in illegal firearm transactions and had previously admitted to shooting a companion during a hunting trip. See <u>id</u>. at 566. When the defendant was arrested on weapons charges, he waived his <u>Miranda</u> rights during post-arrest questioning. See <u>id</u>. at 566-67. During the interview the agents also asked the defendant about the alleged shooting. See <u>id</u>. The defendant ultimately confessed to the murder. See <u>id</u>. On appeal to the Supreme Court, the defendant argued that his <u>Miranda</u> waiver was invalid because he had not been informed that he would be asked about the shooting. See <u>id</u>. at 569-71. The Supreme Court denied the defendant's

argument, reasoning that, "[defendant's] allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion," and did not vitiate his Miranda waiver. See id. at 574. The Supreme Court further held that, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect." Id. at 574. Since there was no allegation that the defendant in Spring did not understand the "basic privilege guaranteed by the Fifth Amendment" or "that he misunderstood the consequences of speaking freely with law enforcement officials," the Supreme Court determined that the defendant's waiver was knowing and voluntary. Id. at 575.

Here, the trial court and Appellate Division both found that Petitioner had been informed of the murder charge pending against him. Investigator Greer and Detective Reyes both testified at the suppression motion, and stated that on January 25, 2008, they visited Petitioner at a county jail in Florida after he had been taken into custody for the murder of Jennifer Lane. See ECF No. 6-28 at 22; see also ECF No. 6-29 at 5. Detective Reyes testified that as soon as they saw Petitioner, Petitioner asked, "why am I charged with murder?" See ECF No.

6-28 at 22.  Detective Reyes further testified that it was his understanding that Petitioner already knew that he had been charged with murder.  See id. at 23.  Detective Greer testified to the same version of events, stating:

> [PROSECUTOR]: And, at any point during the time you spent with the defendant in Florida, did you inform him that he was, in fact, charged with murder?
>
> [INVESTIGATOR GREER]: Yes, I did.
>
> [PROSECUTOR]: When was that?
>
> [INVESTIGATOR GREER]: In the very beginning of the interview when we initially met in the interview room.
>
> [. . .]
>
> [PROSECUTOR]: Did the defendant say anything to you about the fact that he was charged with murder?
>
> [INVESTIGATOR GREER]: At the time that he was notified or at any time during the interview?
>
> [PROSECUTOR]: At -- at any time during the interview -- during your meeting?
>
> [INVESTIGATOR GREER]: I believe in response to -- to my statement, he asked why he was charged with murder.  I don't recall if it was a direct response or if it was delayed, but I specifically recall him asking why and using that terminology.

Id. at 7.

Although the initial interaction where the officers informed Petitioner that he had been charged with murder was not

captured on the tape recorder, the remainder of the interview was recorded. See ECF No. 6-4 at 117. Notably, Petitioner asks the following questions at the end of the interview: "So when I'm going back to Jersey?", "So now, I be honest and true what what's the thing to happen to me?", and "I'm gonna do time though right?" Id. at 173-74. Petitioner's questions indicate that he was well aware of the fact that he was facing murder charges.

However, even if Petitioner had not been informed that he had been charged with murder, his Miranda waiver still would not have been invalidated. See Spring, 479 U.S. at 574-75. Petitioner has not alleged that he did not understand the basic privilege guaranteed by the Fifth Amendment, nor has he alleged that he misunderstood the consequences of speaking freely with law enforcement officers. See Spring, 479 U.S. at 575. Petitioner has also not demonstrated that his statement was coerced or involuntary in anyway. Accordingly, the state courts' adjudication of this claim was not an unreasonable application of federal law. Petitioner is not entitled to relief on this claim.

### B. Limiting Instruction Regarding "Prior Bad Acts"

In Grounds Two and Four, Petitioner asserts that the trial court erred in admitting "prior bad acts evidence" through the testimony of witnesses Naquia Rollins ("Rollins"), James Glover

("Glover"), and Kimell Young ("Young").  See ECF No. 1-3 at 7-8.
Petitioner alleges that these witness testimonies about his
previous threats to harm the victim violated his due process
rights, as well as his right against self-incrimination.  See
id. at 7, 10.  Petitioner argues that the prior bad acts
testimony should have either been excluded, or a limiting
instruction should have been provided to the jury.  See id. at
7-8.

At trial, the State sought to introduce testimony from
Rollins, Glover, and Young to demonstrate that Petitioner's
murder of the victim was premeditated.  See ECF No. 35 at 30.
More specifically, Rollins testified that during her phone calls
with the victim, Petitioner would take the phone and tell
Rollins that he "hates that bitch," referring to the victim; "he
does what he wants with her;" and "[h]e'll throw her out the
window if he wanted to."  See id. at 48.  Rollins also testified
that on the day before the murder, she and the victim had gone
to the grocery store and upon their return Petitioner approached
their vehicle stating, "he didn't like what was going on and
that he would make sure that [Rollins] never [saw the victim]
again and there was nothing nobody can do about it."  Id. at 51.

Glover, a neighbor of Petitioner, testified that the day
before the murder, he witnessed the victim arrive home in a
white van with another individual.  See ECF No. 33 at 96.

Glover observed Petitioner approach the white van and speak with the victim. See id. As Petitioner then walked back towards his residence, he stated to Glover, "I'm gonna kill that girl." Id.

Young, another neighbor, testified that the day before the murder, she saw Petitioner sitting on the front step of his residence, visibly upset. See id. at 65. Petitioner stated to Young, "If [I] can't have her, nobody is gonna have her. I hate that bitch." Id. Young added that on a previous occasion, Petitioner had also informed her that the only way he could get the victim to listen to him was "if he shake her up, as far -- as meaning he has to push her around. That's the only way she'll listen." Id. at 65-66.

Prior to trial, the trial court conducted a hearing pursuant to New Jersey Rule of Evidence 104(c) hearing[2] to determine the admissibility of these statements. See ECF No. 6-32. The trial court ruled that the statements were not evidence of prior bad acts pursuant to New Jersey Rule of Evidence 404(b), but rather that the statements were admissions by a party opponent, admissible under New Jersey Rule of Evidence 803(b). See id. at 60, 62, 66, 81. The court ruled the

---

[2] A Rule 104 hearing, like its federal counterpart in Fed. R. Evid. 104, is a hearing conducted outside the presence of the jury so that the trial court may determine issues such as the existence of privilege, qualification of a witness, or admissibility of evidence. N.J. R. Evid. 104.

statements were evidence of Petitioner's intent or motive to
murder the victim. See id. Despite this ruling, defense
counsel later requested that a limiting instruction be provided
to the jury about prior bad acts committed by Petitioner. See
ECF No. 6-37 at 44-46. The trial court denied this request as
it had already held that the evidence was not that of prior bad
acts. See id. The trial court did, however, include a limiting
instruction regarding "statements allegedly made by the
defendant," which provided that:

> There is for your consideration in this case
> oral statements allegedly made by the
> defendant. It is your function to determine
> whether such statements were actually made
> by the defendant; and, if made, whether the
> statements or any portion of them are
> credible. In considering whether or not an
> oral statement was actually made by the
> defendant; and, if made, whether it is
> credible, you should receive, weigh and
> consider this evidence with caution based on
> the generally recognized risk of
> misunderstanding by the hearer or the
> ability of the hearer to recall accurately
> the words used by the defendant. The
> specific words used and the ability to
> remember them are important to the correct
> understanding of any oral communication
> because the presence or absence or change of
> a single word may substantially change the
> true meaning of even the shortest sentence.
>
> You should therefore receive, weigh and
> consider such evidence with caution. In
> consider whether or not the statement is
> credible, you should take into consideration
> the circumstances and facts as to how the
> statement was made, as well as all other
> evidence in this case relating to this

issue.  If, after consideration of all these
factors you determine that the statement was
not actually made or that the statement is
not credible, then you must disregard the
statement completely.  If you find the
statement was made and that part or all of
the statement is credible, you may give what
weight you think appropriate to the portion
of the statement you find to be truthful and
credible.

Id. at 53.

On appeal, the Appellate Division held that only the

statements made by Petitioner the day before the murder were

admissible to show that he had intended to kill the victim – an

element of the charged offense.  See Lawrence, 2013 WL 4045596,

at *9.  Any earlier statements, however, were not direct

evidence of the crime and were indeed evidence of prior bad

acts.  See id. at *10.  Yet, the Appellate Division determined

that the trial court's failure to include a limiting instruction

about prior bad acts evidence was a harmless error and was "not

clearly capable of producing an unjust result."  Id. (internal

quotations omitted).  The Appellate Division concluded that,

"[t]here is little or no likelihood that the court's omission to

give a limiting instruction as to the vague statements defendant

made on previous occasions caused the jury to reach a result it

otherwise might not have reached."  Id.

"Habeas relief for a due process violation concerning an

absent or defective instruction is available when the absence of

an instruction, or a defective instruction, infects the entire trial with unfairness." See Albrecht v. Horn, 485 F.3d 103, 129 (3d Cir. 2007) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The petitioner bears the burden of demonstrating that the failure to include the limiting instruction was prejudicial. See Henderson v. Kibbe, 431 U.S. 145, 154 (1977). This burden is "even greater than the showing required to establish plain error on direct appeal." Id. Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. "[U]nless [the error] had [a] substantial and injurious effect or influence in determining the jury's verdict," then it is deemed harmless. See Adamson v. Cathel, 633 F.3d 248, 259 (3d Cir. 2011) (quoting Fry v. Pliler, 551 U.S. 112, 116 (2007)). If, however, the error did have a substantial and injurious effect or influence, then by definition, the error resulted in actual prejudice. See id.

Here, Petitioner has failed to demonstrate that the admission of the prior bad acts evidence – specifically, that Petitioner hated the victim, that he had to push her around to make her listen, and that he would throw her out the window if he could – infected the entire trial with unfairness. This is apparent when considering the evidence "in the context of the entire trial." See Allison v. Superintendent Waymart SCI, 703 F. App'x 91, 97 (3d Cir. 2017) (quoting Donnelly v.

DeChristoforo, 416 U.S. 637, 639 (1974)); see also Albrecht v. Horn, 485 F.3d 103, 129 (3d Cir. 2007) (stating that whether a constitutional violation has occurred will depend, in part, upon the overall evidence presented in the case) (citing Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1005)). Significantly, the evidence presented in the case included the fact that Petitioner confessed to stabbing the victim seventeen times and the fact that he stated hours before the murder that he "hate[d] that bitch" and that he was "gonna kill that girl." Lawrence, 2013 WL 4045596, at *9-10. In the context of the entire trial, Petitioner's prior bad acts statements that he hated the victim and he would throw her out a window if he could, were not so prejudicial as to infect the entire trial with unfairness.

Accordingly, the Appellate Division's conclusion that the admission of the prior bad acts evidence did not produce an unjust result, was not an unreasonable application of federal law. Petitioner is not entitled to relief on this claim.

### C. Petitioner's Alleged Abuse of Victim

In Ground Three, Petitioner argues that he was "greatly prejudiced by baseless and unremediated testimony produced by the State that he had previously hit the victim." See ECF No. 1-3 at 9. Petitioner's claim is based upon the following exchange that occurred during the State's direct examination of witness Kimell Young:

[STATE]: Okay. Did you ever see the defendant
hit Jenny?

[STATE]: Oh, withdrawn.

[THE COURT]: Okay. Thank you.

[YOUNG]: Oh, I seen --

[STATE]: No, no. It's withdrawn.

[THE COURT]: It's withdrawn.

[STATE]: Nevermind.

[THE COURT]: Next question, please.

ECF No. 6-33 at 71.

Petitioner contends that this "highly inflammatory
question" which "received a positive answer" was unduly
prejudicial and the trial court should have provided a limiting
instruction. See ECF No. 1-3 at 9. Petitioner, however, does
not cite to any federal law to support his claim for habeas
relief, nor does he allege which constitutional right, if any,
was violated.

In denying this claim on direct appeal, the Appellate
Division held that not only had the witness not answered the
State's question, but that the trial court had properly issued a
limiting instruction during the final jury charge, which stated:

> I have sustained objections to some
> questions asked by counsel, which may have
> contained statement of certain facts. *The
> mere fact that an attorney asked a question
> and inserts facts or comments or opinions in
> that question in no way proves the existence*

33

> *of those facts*.  You will only consider such
> facts which in your judgement have been
> proven by the testimony of witnesses or from
> exhibits admitted into evidence by the
> Court.

<u>Lawrence</u>, 2013 WL 4045596, at *10-11 (emphasis in original).

Accordingly, the Appellate Division held that the trial court had not committed plain error and the State's unanswered question "could hardly have caused the jury to reach a verdict it otherwise would not have reached, particularly in view of the undisputed testimony that defendant stabbed [the victim] seventeen times, after threatening to kill her."  <u>See id</u>. at *11.

"[H]abeas petitioners [. . .] are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>United States v. Lane</u>, 474 U.S. 438, 449 (1986)).  If the error had a "substantial and injurious effect or influence in determining the jury's verdict," then it resulted in actual prejudice.  <u>See</u> <u>Adamson</u>, 633 F.3d at 259-60 (2011) (quoting <u>Fry</u>, 551 U.S. at 116).  However, if a reviewing court determines that the error "did not influence the jury, or had but very slight effect, the verdict and judgment should stand."  <u>Id</u>. at 260 (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 437-38 (1995).

Here, the Appellate Division aptly found that the State's unanswered question "could hardly have caused the jury to return

a verdict it otherwise would not have reached[.]" See Lawrence,
2013 WL 4045596, at *11. The Appellate Division's conclusion is
especially evident when considering the other testimony admitted
at trial, which included Petitioner's statements that he
"hate[d] that bitch," and "I'm gonna kill that girl." See ECF
No. 33 at 65, 96. Additionally, despite Petitioner's claim that
the trial court did not provide a limiting instruction, the
trial court did, in fact, provide such an instruction during the
final jury charge. See ECF No. 6-37 at 50. The trial court
explicitly informed the jury that although an attorney may have
inserted facts into the form of a question, those questions "in
no way prove[d] the existence of those facts." See id. at 50.

Consequently, Petitioner has failed to demonstrate that the
unanswered question about whether he previously struck the
victim had a "substantial and injurious effect or influence in
determining the jury's verdict." Fry, 551 U.S. at 116. Nor has
he demonstrated that the Appellate Division's adjudication of
this claim was an unreasonable application of clearly
established federal law. Accordingly, Petitioner is not
entitled to relief on this claim.

### D. Prosecutorial Misconduct

In Ground Five, Petitioner argues that the prosecutor
engaged in misconduct when she referenced "overly prejudicial
evidence" about the victim's child during her opening statement

35

and direct examination of two of the State's witnesses.  <u>See</u> ECF

No. 1-3 at 14.  Specifically, Petitioner alleges that the

following statements during the prosecutor's opening were

improper:

> And, the evidence will show that, when [the
> victim] stumbled up those basement stairs,
> her young son was right on her heels.  And,
> ladies and gentlemen, while Jennifer lay
> there dying in a pool of her own blood, the
> evidence will show that this man came
> rushing up out of that basement soon after.

<u>Id.</u>; <u>see also</u> ECF No. 6-33 at 17.

Petitioner also argues the following exchanges between the

Prosecutor and Officers Galiazzi and Roberts were improper:

> [PROSECUTOR]: And, could you describe the
> scene in the basement when you went down
> there?
>
> [OFFICER GALIAZZI]: Yes.  There was the --
> the little baby was laying on the mattress.
> Next to the mattress, there was a pool of
> blood, and there was little bloody
> footprints all around the basement and up
> the basement steps.

ECF No. 6-33 at 52.

> [PROSECUTOR]: What happened when you arrived
> [at the scene]?
>
> [OFFICER ROBERTS]: I was met at the door by
> a Mr. Harry Winsch.  I believe I'm
> pronouncing his name right.  I'm not -- W-I-
> N-C-H, I think it is.  He directed me into
> the house. In the house I found -- well,
> later I identified as Ms. Lane lying on the
> ground with numerous stab wounds to her --
> to her and blood all over -- like, lying in
> a pool of blood and, you know, all

> coagulated . . . .

Id. at 27.

Prior to trial, during the court's Rule 104(c) hearing, the court barred witness testimony that the victim's baby had been found sitting on top of his mother's lifeless body, crying, and covered in her blood. See ECF No. 6-32 at 91. While the trial court excluded these statements as "overly prejudicial," the trial court permitted testimony that after the victim came out of the basement seeking help, that her son had also come upstairs after her. See id. at 95-96.

On direct appeal, Petitioner argued that the prosecutor's references to the victim's child at trial were so overly prejudicial as to constitute prosecutorial misconduct. See ECF No. 5 at 22-24. The Appellate Division did not address this claim on its merits, however, concluding only that the argument was "without sufficient merit to warrant discussion in a written opinion." Lawrence, 2013 WL 4045596.

In considering the issue of prosecutorial misconduct on habeas review, the Third Circuit has stated:

> The Supreme Court has held that federal
> habeas relief may be granted when the
> "prosecutorial misconduct may 'so infec[t]
> the trial with unfairness as to make the
> resulting conviction a denial of due
> process." ' Greer v. Miller, 483 U.S. 756,
> 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)
> (quoting Donnelly v. DeChristoforo, 416 U.S.
> 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431

(1974)). The Court further opined that for
due process to have been offended, "the
prosecutorial misconduct must be 'of
sufficient significance to result in the
denial of the defendant's right to a fair
trial." ' Id. (citing United States v.
Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375,
87 L.Ed.2d 481 (1985) (quoting United States
v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392,
49 L.Ed.2d 342 (1976))). See also Ramseur v.
Beyer, 983 F.2d 1215, 1239 (3d Cir. 1992)
(our review of a prosecutor's conduct in a
state trial in a federal habeas proceeding
is limited to determining whether the
prosecutor's conduct " 'so infect[ed] the
trial with unfairness as to make the
resulting conviction a denial of due
process." ' (quoting Greer, 483 U.S. at 765,
107 S.Ct. 3102)). This determination will,
at times, require us to draw a fine line-
distinguishing between ordinary trial error
on one hand, and " 'that sort of egregious
misconduct which amounts to a denial of
constitutional due process" ' on the other
hand. Ramseur, 983 F.2d at 1239 (quoting
United States ex rel. Perry v. Mulligan, 544
F.2d 674, 678 (3d Cir. 1976)).

Werts v. Vaughn, 228 F.3d 178, 197-98 (3d Cir. 2000).

In evaluating whether the remarks of the prosecutor rise to

the level of a constitutional violation, "Supreme Court

precedent requires the reviewing court to weigh the prosecutor's

conduct, the effect of the curative instructions and the

strength of the evidence." See Moore v. Morton, 255 F.3d 95,

107 (3d Cir. 2001) (citing Darden v. Wainwright, 477 U.S. 168,

182 (1986)); see also Werts, 228 F. 3d at 198 (citations

omitted) ("The remarks must be sufficiently prejudicial in the

context of the entire trial to violate a petitioner's due process rights.")

Here, considering the entire record in context, this Court does not find that the prosecutor's remarks or the testimony provided by the officers "so infected the trial with unfairness as to make the resulting conviction a denial of due process." See Greer, 483 U.S. at 765. As the trial court instructed, the prosecutor did not mention that the victim's child had been found lying in his mother's blood. Rather, the prosecutor only stated in her opening that the child had climbed the basement stairs after his mother – evidence which the trial court had ruled admissible during the Rule 104(c) hearing. Moreover, the trial court also twice instructed the jury that openings by counsel are not evidence and must not be treated as evidence. See ECF No. 6-37 at 49; see also ECF No. 6-33 at 11; see also Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("a jury is presumed to understand a judge's answer to its question").

The prosecutor also did not specifically elicit testimony from either Officer Roberts nor Officer Galiazzi about the victim's child. The prosecutor simply asked the officers about their observations when they arrived at the scene of the crime. Officer Galiazzi testified that he saw "little bloody footprints" in the basement and on the basement steps. See ECF No. 6-33 at 52. While this observation of bloody footprints by

Officer Galiazzi may be deemed prejudicial, this Court does not find that it was the "sort of egregious misconduct which amounts to a denial of constitutional due process," especially in light of the fact that the trial court permitted evidence that the child had come upstairs after his mother.  Further, the trial court also provided following instruction to the jury:

> As jurors it is your duty to weigh the evidence calmly and without passion, prejudice or sympathy.  Any influence caused by these emotions has the potential to deprive both the State and the defendant of what you promised them, a fair and impartial trial by fair and impartial jurors.

ECF No. 6-37 at 48.

The evidence against this Petitioner was simply overwhelming.  See Berger v. United States, 295 U.S. 78, 89 (1935) (holding that "if the evidence against [the defendant] had been strong, or, as some courts have said, the evidence of his guilt was 'overwhelming'" then courts may be justified in finding that instances of prosecutorial misconduct did not result in prejudice); see also Marshall v. Hendricks, 307 F.3d 36, 69 (3d Cir. 2002) ("we read United States Supreme Court precedent [referring to Berger] as establishing the principle that the stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair, whereas prosecutorial misconduct is more likely to violate due process when evidence is weaker.")  Petitioner

admitted to stabbing the victim, he had no defensive wounds, and three witnesses testified to statements he made the day before the murder which demonstrated his intent to harm the victim. In weighing the prosecutor's conduct, the trial court's instructions to the jury, and the evidence against the Petitioner, this Court does not find that the comments about the victim's child fundamentally deprived Petitioner of a fair trial. The Appellate Division's adjudication of Petitioner's claim was not an unreasonable application of federal law, and Petitioner is not entitled to habeas relief on this claim.

### E. Trial Court's Jury Instruction Regarding Hindering Prosecution Charge

In Ground Six, Petitioner alleges that the trial court provided "erroneous" instructions as to Count Four of the indictment, hindering one's own apprehension or prosecution, in violation of N.J. Stat. Ann. § 2C:29-3b(4). See ECF No. 1-3 at 16-17. The verdict sheet containing the charge of hindering one's own apprehension or prosecution provided, in pertinent part:

> On or about the 8th day of January, 2008, in the City of Camden, in the County of Camden, [Ernest Lawrence], and within the jurisdiction of this Court, did with purpose to hinder his own detention, apprehension, investigation, prosecution, conviction or punishment for the crime of Possession of a Weapon for an Unlawful Purpose give false information to a law enforcement officer, contrary to the provisions of N.J.S. 2C:29-

3b(4), and against the peace of this State,
the Government and dignity of the same.

ECF No. 6-4 at 95.

The verdict sheet went on to state:

i. In order for you to find the defendant
guilty of Hindering Apprehension or
Prosecution, the State must prove the
following elements beyond a reasonable
doubt:

1. That the defendant knew that he had
been or was likely to be charged with
Possession of a Weapon for [an]
Unlawful Purpose;

2. and the defendant gave false
information to a law enforcement
officer and

3. that the defendant acted with
purpose to hinder his own detention,
apprehension, investigation,
prosecution, or conviction.

Id.

During jury deliberations at trial, the jury sent out the

following note:

Judge Wells, could you please clarify Count
4 instructions, do we consider the attempt
to leave [the] country or do we just
consider the 8th day of January?

ECF No. 6-37 at 76.

After consultation with, and unanimous agreement from, the

State and defense counsel as to the appropriate response to this

question, the trial court instructed the jury to, "just consider

the 8th day of January." See id. at 78. Shortly thereafter, the

42

jury sent out a subsequent note asking:

> Can we please see Ernest Lawrence statement
> from the 8th of January, 2008 [. . .] or do
> you mean the first interview with police
> which was January 9th, 2008?

ECF No. 6-37 at 78.

Again, after consultation with the State and defense
counsel, the trial court instructed the jury: "[t]here is no
statement from the 8th of January by Ernest Lawrence.  The
indictment at Count 4 refers to 'on or about the 8th day of
January 2008.'"  See id. at 85.

Petitioner now argues that the trial court failed to
clarify the jury's confusion and that such an error "warrants a
reversal."  See ECF No. 1-3 at 17.  Petitioner asserts that the
jury could have concluded that Count Four was based upon his
leaving the scene of the crime, or his attempting to leave the
country.  Id. at 16.  Petitioner contends that the trial court's
responses excluded these possibilities and, as a result, "[took]
away the fact-finding process from the jury."  See id. at 16-17.
The Appellate Division summarily denied this claim on direct
appeal stating that it was without sufficient merit to warrant
discussion.  See Lawrence, 2013 WL 4045596, at *12.

As discussed previously, "[h]abeas relief for a due process
violation concerning an absent or defective instruction is
available when the absence of an instruction, or a defective

instruction, infects the entire trial with unfairness." See
Albrecht, 485 F.3d at 129 (citing Cupp, 414 U.S. at 147).
"Before a federal court may overturn a conviction resulting from
a state trial in which this instruction was used, it must be
established not merely that the instruction is undesirable,
erroneous, or even 'universally condemned,' but that it violated
some right which was guaranteed to the defendant by the
Fourteenth Amendment." Cupp, 414 U.S. at 146. "A jury is
presumed to understand a judge's answer to its question."
Weeks, 528 U.S. at 234. If a jury remains confused as to their
role, "they might, and probably would, have signified their
desire to the court." See id. (quoting Armstrong v. Toler, 11
Wheat. 258, 279, 6 L.Ed. 468 (1826) (opinion of Marshall,
C.J.)).

     Here, Petitioner has not demonstrated that the trial
court's instructions in response to the jury's questions
violated a federal right. Petitioner puts forth only a bald
assertion that the trial court's instructions were "erroneous"
and that the responses "[took] away the fact-finding process
from the jury." See ECF No. 1-3 at 17. Petitioner's
alternative theories about what circumstances the jury could
have interpreted Count Four to include overlooks the wording of
the verdict sheet. The verdict sheet, and the indictment
itself, refers to whether, on or about January 8, 2008,

Petitioner hindered his apprehension or prosecution for possession of a weapon for an unlawful purpose by "*giv[ing] false information to a law enforcement officer*." <u>See</u> ECF No. 6-4 at 95 (emphasis added); <u>see also</u> ECF No. 6-2 at 5.

Contrary to Petitioner's theories, the jury was only instructed to consider Petitioner's statement to police on or about January 8, 2008. The jury was not instructed to consider Petitioner's attempt to flee the country, and the trial court cured that confusion when it instructed, with unanimous consent from both counsel, that the jury was only to consider the eighth day of January for Count Four. When the jury returned with a follow-up question, the jury's only confusion was as to the date of the statement. Again, the trial court appropriately instructed that there was no statement on January 8, 2008; and directed them back to the language of the indictment which stated "on or about the 8th day of January 2008." <u>See</u> ECF No. 6-37 at 85. As the jury did not return with another question, it is presumed that the jury understood the court's instructions. <u>See</u> <u>Weeks</u>, 528 U.S. at 234.

Consequently, Petitioner has failed to demonstrate that the trial court's responses to the jury's questions "infected the entire trial with unfairness" or that the instructions violated his constitutional rights. Accordingly, Petitioner is not entitled to relief on this claim.

**F. Petitioner's Mental Health**

In Ground Seven, Petitioner argues that his statement to police on January 9, 2008 should have been suppressed because he was "not coherent" to answer questions. See ECF No. 1-3 at 18-19. Specifically, Petitioner asserts that the medications he was taking at the time rendered his statement inadmissible under Miranda. Id. In support of his claim, Petitioner points to the testimony of his attending physician in the hospital, Dr. Kenneth Burns. See ECF No. 6-35 at 18. Dr. Burns testified at trial that Petitioner had been provided a Morphine drip for pain management on January 8th and January 9th, following Petitioner's surgery. See id. at 18. Petitioner now alleges that this "heavy medication" rendered him unable to provide a statement knowingly, voluntarily, and intelligently. See ECF No. 1-3 at 19.

Prior to trial, a suppression hearing was held to determine the admissibility of the statement Petitioner made to the police while he was in the hospital. See ECF Nos. 27-29. Investigator Greer and Detective Reyes, the two officers who interviewed Petitioner at that time, both testified. See id. Each officer stated that Petitioner was "alert" and "coherent" at the time of the interview, as demonstrated by the following excerpts of their testimony:

[PROSECUTOR]: And can you describe
[Petitioner's] demeanor and his appearance
as you read the [Miranda] form to him?

[INVESTIGATOR GREER]: Alert, coherent,
cooperative.

[PROSECUTOR]: And in the course of your
employment as both an investigator and
before that a sergeant in a police force,
have you ever dealt with people who have
been injured or otherwise in physical or
mental distress?

[INVESTIGATOR GREER]: Yes.

[PROESCUTOR]: And did the defendant appear
at that time to be injured or in physical or
mental distress?

[INVESTIGATOR GREER]: Not at all, no.

ECF No. 6-27 at 27-28.

[PROSECUTOR]: The defendant's demeanor, when
you -- when you went in and -- and you and
Investigator Greer were present in the room
with him, what was his appearance?  What did
he look like as you were talking to him?

[DETECTIVE REYES]: He -- he appeared
exhausted.

[PROSECUTOR]: Uh-huh.

[DETECTIVE REYES]: Scared.

[PROSECUTOR]: Did he seem to be coherent?

[DETECTIVE REYES]: Yes, he was.

[PROSECUTOR]: Was he cooperative?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: Was he alert?

[DETECTIVE REYES]: Yes, he was.  Matter of fact, he sat up higher on the bed --

[PROSECUTOR]: Okay.

[DETECTIVE REYES]: -- as Investigator Greer was reading [the Miranda form] to him and he was circling each one and initialing it.

[PROSECUTOR]: In the course of your employment with Camden Police -- and generally, have you ever dealt with people who were injured or otherwise in physical or mental distress?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: And did the defendant appear to be injured or otherwise in physical distress?

[DETECTIVE REYES]: Did he appear distressed? No.  He appeared okay.

[PROSECUTOR]: Did he appear to be physically injured?

[DETECTIVE REYES]: He was physically injured, but he was comfortable.  He didn't appear to be much in pain or anything like that.

[PROSECUTOR]: Was he able -- was your impression that he was able to understand you?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: And that he was able to understand Investigator Greer?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: Was he able to converse with you coherently?

[DETECTIVE REYES]: Yes.  It was so much that he even mentioned that there was police officers outside the room, you know.

[. . .]

[PROSECUTOR]: During the time that you've been a police officer, have you ever dealt with anybody who was intoxicated by drugs or alcohol?

[DETECTIVE REYES]: Yes.

[PROSEUCTOR]: Did the defendant appear to be intoxicated in any way?

[DETECTIVE REYES]: No.

[PROSECUTOR]: Did the defendant respond to Inv -- Investigator Greer's questions when he read the Miranda form?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: Was the defendant's speech slurred in any way?

[DETECTIVE REYES]: No.

[PROSECUTOR]: Was it coherent?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: Could you understand what he was saying?

[DETECTIVE REYES]: Yes.

[. . .]

[DEFENSE COUNSEL]: When you went into the hospital, you said you went into risk management, right?

[DETECTIVE REYES]: Yes.

[DEFENSE COUNSEL]: And you said they cleared you to go see Mr. Lawrence?

[DETECTIVE REYES]: Yes.

[DEFENSE COUNSEL]: Did they tell you what his physical condition was at the time?

[DETECTIVE REYES]: No, they told us that he was coherent, he's able to speak to us.

[DEFENSE COUNSEL]: Physical condition?

[DETECTIVE REYES]: They -- they didn't tell us what kind of physical condition he was in.

[DEFENSE COUNSEL]: Well, did you know that he was stabbed numerous times?

[DETECTIVE REYES]: No.

[DEFENSE COUNSEL]: You didn't know that?

[DETECTIVE REYES]: No.

[DEFENSE COUNSEL]: Did you know that he had undergone emergency surgery?

[DETECTIVE REYES]: No.

[DEFENSE COUNSEL]: Uh-huh.  Did you know that he was on a morphine drip because of his pain?

[DETECTIVE REYES]: No.

[DEFENSE COUNSEL]: Okay.  So, did you ask him whether or not he was on any drugs that would prevent him from understanding what was going on that day?

[DETECTIVE REYES]: I believe Investigator Greer did ask him that question.

[DEFENSE COUNSEL]: Okay. He asked him that before you went on tape?

[DETECTIVE REYES]: I don't remember.

[. . .]

[DEFENSE COUNSEL]: Well, Judge, there's a stipulation that that [question] was not [in the statement transcript.]

[. . .]

[DEFENSE COUNSEL]: And -- but do you have an independent recollection, as we sit here today, if you asked him whether he was on any medication that would prevent him from understanding what he was doing?

[DETECTIVE REYES]: Ask who?

[DEFENSE COUNSEL]: Ask the defendant?

[DETECTIVE REYES]: Pretty sure we did.

[. . .]

[DEFENSE COUNSEL]: Okay. You went into the room and you're pretty sure you asked him whether he was under any -- taking any medication, is that your testimony?

[DETECTIVE REYES]: I'm pretty sure we did.

[DEFENSE COUNSEL]: And what do you think you said?

[DETECTIVE REYES]: He said he was okay.

[DEFENSE COUNSEL]: Okay.  Did he say that he was on medication?

[DETECTIVE REYES]: He didn't say he wasn't on medica -- how you feeling?  He said I'm feeling okay.

[DEFENSE COUNSEL]: Okay.  But what else did you say to him?

[DETECTIVE REYES]: Like can he -- can you tell us what happened that day?

[DEFENSE COUNSEL]: So you said are you okay and can you tell us what happened?

[DETECTIVE REYES]: Yeah, that's --

[DEFENSE COUNSEL]: And that's it?

[DETECTIVE REYES]: -- what my partner asked him.

[. . .]

[PROSECUTOR]: You said when you first went to the hospital on January 9th, you and Investigator Greer went to risk management, correct?

[DETECTIVE REYES]: Yes -- yes.

[PROSECUTOR]: And then how does risk management determine whether the defendant can speak to you?

[DETECTIVE REYES]: They call upstairs to the nurses' station.

[PROSECUTOR]: To the floor where the defendant is being taken care of?

[DETECTIVE REYES]: Yes.

[PROSEUCTOR]: And were you told that he was coherent to speak with?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: Okay. And you have been turned away in the past in --

[DETECTIVE REYES]: Oh --

[PROSECUTOR] -- with other patients?

[DETECTIVE REYES]: -- many times, many
times.

[PROSECUTOR]: Have you been told the patient
is not coherent to speak with you in the
past?

[DETECTIVE REYES]: Yes.  Matter of fact, I
had -- I had them on the phone they told me
to go to hell.

[PROSECUTOR]: Okay.  With regard to the
medication that defendant may or may not
have been on at the time you spoke with them
in the -- for the first time in the
hospital, did he seem -- did he seem --
you've taken, you said, almost a hundred or
so statements?

[DETECTIVE REYES]: Yes.

[PROSECUTOR]: Did this defendant, in your
experience, seem not to understand you or
Investigator Greer in any way?

[DETECTIVE REYES]: He appeared to be alert.
You know, it -- it surprised me because of
aggravated assaults that I have done in the
past.  He was alert and talking to us like a
normal person.  He wasn't, like, laying back
and he actually had the remote, got
comfortable, sat up higher, and started
talking to us.

ECF No. 6-28 at 14-16; 30-32; 34; 44-45.

Following the three-day suppression hearing, the trial

court found that both officers' testimonies were credible.  See

ECF No. 6-4 at 69.  The trial court stated that "[b]oth officers

generally testified that defendant appeared to be coherent and

did not appear to be under duress.  After reviewing the

transcript of defendant's statement [from January 9, 2008], the

53

court is satisfied defendant was responsive to the officers

questioning[.]" Id. at 86.  The trial court ultimately

concluded that "based upon the totality of the circumstances,"

Petitioner knowingly, voluntarily, and intelligently waived his

privilege against self-incrimination.  See id. at 86-87.

Petitioner argued on direct appeal that his Miranda waiver

was invalid because the medications he had taken made him

incoherent.  See Lawrence, 2013 WL 4045596, at *12.  However,

the Appellate Division found that Petitioner's claim was without

sufficient merit to warrant discussion.  See id.

For a Miranda waiver to be valid, it must meet two

requirements:

> First, the relinquishment of the right must
> have been voluntary in the sense that it was
> the product of a free and deliberate choice
> rather than intimidation, coercion, or
> deception. Second, the waiver must have been
> made with a full awareness of both the
> nature of the right being abandoned and the
> consequences of the decision to abandon it.
> Only if the 'totality of the circumstances
> surrounding the interrogation' reveal both
> an uncoerced choice and the requisite level
> of comprehension may a court properly
> conclude that the *Miranda* rights have been
> waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (internal quotations

and citations omitted).

"Federal habeas courts have an 'independent obligation' to

determine whether a confession was voluntary."  Sweet v. Tennis,

386 F. App'x 342, 345 (3d Cir. 2010) (citing Miller v. Fenton,
474 U.S. 104, 110 (1985)). While the "ultimate question
whether, under the totality of the circumstances, the challenged
confession was obtained in a manner compatible with the
requirements of the Constitution is a matter for independent
federal determination," courts should defer to a state court's
fact-finding on "subsidiary factual questions." Miller, 474
U.S. at 112. Subsidiary factual questions, "such as whether a
drug has the properties of a truth serum, or whether in fact the
police engaged in the intimidation tactics alleged by the
defendant," are entitled to the § 2254(d) presumption of
accuracy. See id. (internal citations omitted). "And the
federal habeas court, should, of course, give great weight to
the considered conclusions of a coequal state judiciary." Id.

Additionally, numerous courts have held that the presence
of Morphine does not necessarily render an individual's
statement invalid under Miranda. See Davis v. Workman, 695 F.3d
1060, 1068-70 (10th Cir. 2012) (upholding state court's
determination that petitioner, who was under the influence of
morphine, was still able to knowingly and intelligently waive
his Miranda rights); see also United States v. Breton-Rodriguez,
232 F. App'x 725 (9th Cir. 2007) ("[Petitioner]'s waiver of his
Miranda rights is not rendered involuntary simply because he was
receiving morphine and in considerable pain."); see also United

55

States v. Adamson, Crim. No. 04-672, 2008 WL 167299, at *7 (E.D. Pa. Jan. 16, 2008) (determining Petitioner voluntarily waived his Miranda rights, despite the fact that he had ingested Morphine and Percocet, because during the interrogation he was coherent, "never appeared sleepy or confused, was able to understand and answer questions asked of him, did not mumble or slur his speech, and never complained that he felt unwell.").

Here, Petitioner has not presented sufficient evidence to overcome the deference owed to the state court's factual findings. Petitioner only baldly asserts that the Morphine caused his statement to be made "unvoluntary, unknowingly, and unintelligently." See ECF No. 1-3 at 19. At trial, Dr. Burns was not questioned about, and did not testify regarding, whether the Morphine affected Petitioner's competency to sign a valid Miranda waiver. Although Petitioner argues that "the nurse who actually did the report" should have been called to testify as to his state of mind, that nurse was not called as a witness by either party, and Petitioner does not allege what the nurse would have even stated. See ECF No. 1-3 at 18.

Comparatively, there was ample evidence presented that Petitioner was alert and coherent during his interview with Officers Greer and Reyes. Each officer, both of whom the trial court found credible, testified that they had experience dealing with individuals who were injured or otherwise in physical or

mental distress, and that Petitioner did not appear incoherent or disoriented in any way. They stated that Petitioner did not appear intoxicated, his speech was not slurred, he appeared to understand each of Investigator Greer's questions, and he was cooperative. Detective Reyes even testified that he recalled asking Petitioner how he was feeling and Petitioner responding that he felt okay.

Taking into account the totality of the circumstances of Petitioner's confession, as well as the entire trial record, this Court does not find that the state courts' adjudication of this claim was an unreasonable application of federal law. Petitioner has not demonstrated that his January 9, 2008 statement was taken in violation of his Miranda rights. Consequently, Petitioner is not entitled to relief on this claim.

### G. Ineffective Assistance of Counsel Claims

In Grounds Eight and Nine, Petitioner raises two ineffective assistance of counsel claims. See ECF No. 1-3 at 20-21; ECF No. 7 at 2. In Ground Eight, Petitioner contends that his trial counsel failed to investigate his mental health at the time of the crime. See ECF No. 1-3 at 20-21. In Ground Nine, Petitioner asserts that his trial counsel failed to review the entire discovery in his case. See ECF No. 7 at 2.

The Sixth Amendment of the United States Constitution

provides: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). A showing of ineffective assistance of counsel requires two components to succeed. See id. at 687. The two requisite proofs are as follows: (1) a defendant must show that counsel's performance was deficient; and (2) the defendant must show prejudice. See id.

When a convicted defendant complains of deficient performance, the defendant's burden of proof is to show that the conduct of counsel fell below an objective standard of reasonableness. See id. at 688. Hence, "[j]udicial scrutiny of counsel's performance must be highly deferential." See id. at 689. To combat the natural tendency for a reviewing court to speculate whether a different strategy at trial may have been more effective, the Supreme Court has "adopted the rule of contemporary assessment of counsel's conduct." See Maryland v. Kulbicki, 136 S. Ct. 2, 4 (2015) (quoting Lockhart v. Fretwell, 506 U.S. 364, 372 (1993)). Thus, when reviewing for ineffective assistance of counsel, "a court must indulge a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance."  See <u>Woods v. Donald</u>, 135 S. Ct. 1372, 1375 (2015) (quoting <u>Strickland</u>, 466 U.S. at 689); <u>cf.</u> <u>United States v. Chronic</u>, 466 U.S. 648, 659 (1984) (holding that courts may presume deficient performance and resulting prejudice if a defendant "is denied counsel at a critical stage of his trial").

Because Petitioner's ineffective assistance of counsel claim is raised through a § 2254 petition, federal "review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'"  See <u>Woods</u>, 135 S. Ct. at 1376 (quoting <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013)); <u>see also</u> <u>Cullen</u>, 563 U.S. at 190 ("[R]eview of the [State] Supreme Court's decision is thus doubly deferential."); <u>see</u> <u>also</u> <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) ("[D]oubly deferential judicial review applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard . . . ."); <u>see</u> <u>also</u> <u>Yarborough</u>, 541 U.S. at 6 ("Judicial review of a defense attorney ... is therefore highly deferential--and doubly deferential when it is conducted through the lens of federal habeas.").  Indeed, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard."  See <u>Harrington</u>, 562 U.S. at 105.

As to proving prejudice under Strickland, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." Strickland, 466 U.S. at 693. To succeed on this proof, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Hinton v. Alabama, 571 U.S. 263, 272 (2014) (quoting Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). A reasonable probability is a probability which sufficiently undermines confidence in the outcome of the trial. Strickland, 466 U.S. at 694.

### i. Failure to Investigate Petitioner's Mental Health

In Ground Eight, Petitioner alleges that his trial counsel was ineffective for failing to investigate his "mental health problem at the time of the crime." See ECF No. 1-3 at 20. Specifically, Petitioner contends that his trial counsel was aware that Petitioner had a mental health issue and that, at the time of the crime, he had been taking "daily medications (sinequan and visteril) for anxiety and depression," as well as ingesting drugs and alcohol. See id. Petitioner appears to imply that his counsel should have investigated his mental health in order to explore whether an insanity or diminished capacity defense may have been available. See id. at 20-21; see also ECF No. 6-19 at 25-26.

Petitioner first raised this claim during his PCR proceedings.  In denying Petitioner's claim, the Appellate Division reasoned, in pertinent part:

> In the case before us, defendant has not alleged specific facts sufficient to demonstrate counsel's alleged substandard performance.  Defendant's ineffective assistance claim concerning his mental health is based on nothing more than his own unsupported statements, namely, "[m]y attorney was aware I had a mental health problem at the time of the crime.  I was taking daily medications (sinequan and visteril) for anxiety and depression and I was under the influence of drugs and alcohol."  Defendant has offered no documentary evidence of prescriptions for his medications, nor has he offered an expert report or medical literature explaining the effects of his medication either in isolation or when mixed with alcohol and drugs.  In short, defendant has failed to demonstrate than an evaluation "for mental health issues" was even remotely likely to support a diminished capacity or insanity defense, let alone a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.
>
> [. . .]
>
> [H]ere defendant points to no facts in the record concerning his behavior before and after the crime, but merely relies on his own unsupported assertions that he had mental health issues and was under the influence of alcohol and drugs when he committed the crimes.  These unsupported assertions do not demonstrate a prima facie case of ineffective assistance of counsel.

Lawrence, 2016 WL 5210616, at *2.

Here, Petitioner is unable to demonstrate the prejudice prong of Strickland. Petitioner has provided no more than the conclusory allegation that his trial counsel should have had his mental health evaluated. Petitioner has failed to allege what a mental health evaluation would even have shown, or that there is a reasonable probability that having an evaluation conducted would have changed the result of his criminal proceedings. Accordingly, through the doubly deferential lens of federal habeas relief, this Court does not find that the state court's adjudication of this claim was an unreasonable application of federal law. Petitioner is not entitled to relief on this claim.

### ii. Failure to Investigate Discovery Materials

In Ground Nine, Petitioner argues that his trial counsel was also ineffective for failing to review the entire discovery in his case. See ECF No. 7 at 2. In the instant § 2254 action, Petitioner provides only the following:

> In support of his PCR Petition, defendant also attested, in pertinent part, "my attorney also failed to review my entire discovery."
>
> PCR Counsel reiterated at the hearing that trial counsel "failed to review certain discovery." However, the PCR Court, in denying relief, did not address this claim in violation of N.J.Ct.R. 3:22-11.

Id.

On appeal from the denial of Petitioner's PCR, the Appellate Division addressed this claim stating, in pertinent part:

> Equally devoid of merit is defendant's claim his trial counsel was ineffective for failing to review the entire discovery. Defendant does not identify the discovery he claims was not reviewed, nor does he suggest how counsel's review of the entire discovery somehow would have or should have caused counsel to take or refrain from taking any action or engage in a different trial strategy. The argument lacks sufficient merit to warrant further discussion.

Lawrence, 2016 WL 5210616, at *3.

"Where a 'petition contains no factual matter regarding Strickland's prejudice prong, and [only provides] ... unadorned legal conclusion[s] ... without supporting factual allegations,' that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief." Judge v. United States, 119 F. Supp. 3d 270, 281 (D.N.J. 2015) (quoting Palmer v. Hendricks, 592 F.3d 386, 395 (3d Cir. 2010)).

Here, Petitioner has again failed to provide any support for his claim. Petitioner presents only the conclusory allegation that his attorney did not review the entire discovery provided in his case. See ECF No. 6-17 at 2; ECF No. 6-19 at 27; ECF No. 6-23; ECF No. 7 at 2. Significantly, nowhere does Petitioner allege how he was prejudiced by this supposed

deficiency, nor does he allege how the outcome of his criminal proceeding would have been different if his trial counsel had reviewed the entire discovery.  Consequently, Petitioner has failed to demonstrate that the state court's adjudication of this claim was an unreasonable application of federal law. Petitioner is not entitled to relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

The AEDPA provides that an appeal may not be taken to the court of appeals from a final order in a § 2254 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This Court will deny a certificate of appealability because jurists of reason would not find it debatable that dismissal of the Petition is correct.

## V.  CONCLUSION

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability shall not issue.  An appropriate Order follows.


Dated: April 30, 2019              s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.